# IN THE COURT OF APPEALS OF IOWA

No. 22-0847
Filed June 7, 2023

**IN RE THE MARRIAGE OF ALBERT PHILLIP MARASCO
AND JULIE MARASCO**

**Upon the Petition of
ALBERT PHILLIP MARASCO,**
   Petitioner-Appellant/Cross-Appellee,

**And Concerning
JULIE MARASCO,**
   Respondent-Appellee/Cross-Appellant.

_____

   Appeal from the Iowa District Court for Polk County, Celene Gogerty, Judge.


   Albert Marasco appeals and Julie Marasco cross-appeals the property-division provisions of the decree dissolving their marriage. **AFFIRMED AS MODIFIED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**


   David J. Hellstern of Sullivan & Ward, P.C., West Des Moines, for appellant/cross-appellee.

   Nathan A. Russell of Elverson Vasey Law Firm, Des Moines, for appellee/cross-appellant.


   Considered by Vaitheswaran, P.J., and Ahlers and Buller, JJ.

**AHLERS, Judge.**

Albert and Julie Marasco divorced after almost seventeen years of marriage. Over the course of the marriage, Julie worked for the State of Iowa, bringing in steady income and providing health insurance for the couple.[1] This allowed Albert to work as an entrepreneur, and eventually three of his business ventures became successful. One business—InfoNet Corporation, doing business as Summit Products (Summit)—was started prior to the parties' marriage.[2] Two additional businesses—Fresco Windows, Inc. (Fresco) and MarazCo Holding LLC (MarazCo)—were started during the marriage. At the dissolution trial, both parties presented expert witnesses who opined on the value of the three businesses. The district court issued a decree that awarded the businesses to Albert and ordered a property equalization payment to Julie, which was to be paid in monthly installments over the course of fifteen and one-half years. As they did at trial, the parties disagree on appeal as to how to equitably divide their property.[3]

We review dissolution-of-marriage actions de novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). "Accordingly, we examine the entire record and adjudicate anew the issue of the property distribution." *Id.* We are not bound by the district court's findings, but we will only disturb its ruling if we find it failed to do equity. *Id.* Additionally, we will affirm the court's valuation of

---

[1] Julie also provided health insurance for Albert's child from a prior marriage.
[2] Albert and his wife from a prior marriage filed articles of incorporation for Summit in 1996. Albert bought out his prior wife's interest as part of their divorce in 2000.
[3] Albert appealed from the dissolution decree, raising several challenges to the property distribution. Julie cross-appealed and claims the district court failed to consider the value of a loan payable to one of the businesses when it valued the business.

assets if it is within the range of permissible evidence. *Id.* at 679.

We first address Albert's claims that the district court should not have considered Summit in the property division because it is premarital property or, at the very least, the premarital value of Summit should have been set aside as Albert's separate property. Premarital property is divisible in a dissolution. *See* Iowa Code § 598.21(5) (2020) ("The court shall divide *all property*, except inherited property or gifts received or expected by one party, equitably . . . ." (emphasis added)); *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005) (recognizing the requirement to divide all property "means the property included in the divisible estate includes not only property acquired during the marriage by one or both of the parties, but property owned prior to the marriage by a party"). And "[t]he district court 'may not separate [a premarital] asset from the divisible estate and automatically award it to the spouse that owned the property prior to the marriage.'" *In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007) (second alteration in original) (quoting *In re Marriage of Sullins*, 714 N.W.2d 242, 247 (Iowa 2006)).

The above being said, the property brought into the marriage is a factor to consider in determining an equitable property division. *See* Iowa Code § 598.21(5)(b) (listing "[t]he property brought to the marriage by each party" as a factor to consider in determining property division). This factor can be used to essentially set aside the premarital value of property to the spouse bringing the property into the marriage when it is equitable to do so. *See, e.g.*, *In re Marriage of Wendell*, 581 N.W.2d 197, 199 (Iowa Ct. App. 1998) (noting that consideration of the value of premarital property "may justify a full credit, but it is not required"). But equity is determined on a case-by-case basis, as it is a fact-intensive inquiry.

Here, we see no inequity in the district court declining to carve out any portion of the value of Summit as Albert's separate property. When Albert divorced his prior wife in 2000, he paid her $10,000 for her fifty-one percent ownership in Summit, suggesting it was not a thriving business. And there is no persuasive evidence that business was booming at Summit when these parties married in 2005. Summit's balance sheet at year-end 2005 shows equity of $61,227, and Summit's 2005 tax return shows ordinary business income of $26,449. The parties were struggling to pay their bills. Around 2008, things had not turned around, as Albert came to Julie and informed her that things were so grim that he was considering closing the Summit business. The couple toughed it out, kept Summit open, and reaped the rewards of doing so. In stark contrast to the bleak numbers from Summit's 2005 tax return, the company's 2020 tax return shows ordinary business income of $971,251, and the evidence suggests that 2021 was an even better year for the company.[4] This tremendous growth in the company led to the parties' experts valuing Summit at between $3,748,000 (by Albert's expert) and $5,979,800 (by Julie's expert). Given the length of the marriage; Julie's contributions to the marriage; the comparably inconsequential value of Summit at the time of the marriage and the early years of it; and the value of Summit at the

---

[4] As part of Albert's effort to set aside part of the value of Summit as nonmarital property, Albert's expert placed a premarital value on Summit by considering its start-up value in 1996, considering its time-of-trial value in 2022, and then extrapolating a value at the time of the marriage in 2005 as if the growth in the company's value from 1996 to 2022 was linear. As noted in the above description, Summit's growth was anything but linear. The company struggled for many years before and during the marriage until hitting its stride around 2018 to build up to the valuable company it is today. For this reason, we afford no meaningful weight to Albert's expert's time-of-marriage valuation.

time of trial, we find the district court was correct in not treating any part of the value of Summit as Albert's separate property for purposes of determining an equitable property division.

We turn to Albert's backup argument—that the district court incorrectly valued Summit. In so doing, Albert first claims the district court made several incorrect factual findings. Some of the purported factual inaccuracies would not impact the court's valuation of Summit.[5] Others relate to a loan of roughly $1.8 million from Summit to Fresco and whether the parties' respective experts properly considered it when opining on Summit's value. Julie's cross-appeal also relates to the loan. She claims the district court should have considered the loan an asset of Summit, which would have raised its value by the amount of the loan.[6]

We conclude the district court accurately valued Summit at $5,979,800. This is the fair-market value established by Julie's expert. When considering the valuations proposed by the parties' respective expert witnesses, the court found Julie's expert's "conclusions more consistent with the credible evidence [and] g[ave] it more weight." The court explained it agreed with Julie's expert that Summit's own ability to secure a loan for capital improvements in excess of $10 million supports Julie's expert's higher valuation of Summit than that of Albert's

---

[5] Albert complains that the court stated MarazCo purchased two adjoining lots instead of three, the court found Fresco to be profitable at the time of dissolution even though "it was being propped up financially by Summit," and the court stated Julie moved out of the marital home in 2019 instead of 2018. Albert goes on to claim that Summit's financial gains between Julie's 2018 move and the date of the dissolution decree should not be distributable to Julie. But that argument goes to the equitable division of property as opposed to the court's valuation of Summit.

[6] Julie does not address that this would simultaneously reduce the value of Fresco in equal measure.

expert. The district court also questioned the reliability of Albert's expert given the expert's phrasing in his report, which the court described as "fawning terms," when describing Albert's businesses and the expert's use of two separate valuation methodologies without explanation as to why one was more reliable than the other. We defer to the district court's credibility determination favoring Julie's expert's valuation of Summit. *See In re Marriage of Schildberg*, No. 05-0081, 2005 WL 3115872, at *2 (Iowa Ct. App. Nov. 23, 2005) ("Normally, we defer to a district court's assessment of 'dueling' expert witnesses because that court is in a better position to judge the credibility of witnesses.").

In crediting the district court's decision to adopt Julie's expert's valuation, we take no issue with the expert's approach to the loan between Fresco and Summit. When valuing Summit, Julie's expert did not consider the loan to Fresco as a receivable. Likewise, when valuing Fresco, the expert did not consider the loan as a debt, so it was a wash between the two companies. Because both Summit and Fresco were divisible as part of the marital assets, we think this was an acceptable approach to simplify this complex division of assets. We reject both parties' contentions that the loan from Summit to Fresco was not properly considered when valuing the marital assets. As such, we affirm as to Julie's cross-appeal.

We turn to Albert's final fallback position that the district court simply did not divide the parties' property in an equitable manner. When reviewing the division of property "we accord the trial court considerable latitude in making this determination and will disturb the ruling only when there has been a failure to do equity." *In re Marriage of Okland*, 699 N.W.2d 260, 263 (Iowa 2005) (citation

omitted). "Although an equal division is not required, it is generally recognized that equality is often most equitable." *In re Marriage of Rhinehart*, 704 N.W.2d 677, 683 (Iowa 2005). With these principles in mind, we turn to Albert's specific complaints about the property division.

First, we address Albert's complaint that the district court should have reduced the marital estate by $404,430 to reflect debt held by MarazCo. We reject Albert's challenge because that debt was already accounted for in the valuation of MarazCo that was agreed upon by both experts and adopted by the district court.[7]

Next, we turn to Albert's arguments about various assets that impact the value of the marital estate. Albert points out the district court undervalued Julie's new residence by $500; included $2500 for fishing boats that did not belong to the parties;[8] and included $5000 for Julie's wedding ring, which was a gift to her and should not have been included in the marital property. These sums are relatively minor in a marital estate that the district court valued at $9,321,291.26.[9] Nonetheless, we adjust the value of the parties' property awards to correct these discrepancies. After this adjustment, the total value of the marital estate is reduced to $9,314,291.26. After adding in $500 for Julie's residence and subtracting the value of the wedding ring from Julie's portion of the assets, her property award equals $1,267,796.06. As for Albert, after subtracting the value of the boats erroneously included, his property award totals $8,046,495.20. Additionally, the

---

[7] The two experts applied different discounts to MarazCo's valuation to account for the lack of marketability, and the district court applied a discount that it reached by averaging the two discounts presented by the experts.
[8] The parties agree the fishing boats actually belong to Albert's parents.
[9] This figure and the figures that follow as to the respective division of property are taken from the recapitulation statement attached to the district court's decree.

parties agree that the district court inadvertently awarded Albert a 401(k) account valued at $180,746 that does not exist. We reduce the value of the assets awarded to Albert by $180,746 to lower his property award to $7,865,749.20.[10] Even taking these corrections into account, an equalization payment to Julie remains necessary. We must determine the amount of such payment.

Albert argues the district court's errors in accounting should lead us to conclude "the entire distribution in this matter was incorrectly determined and inequitable" and invites us start fresh. But we think Albert is too quick to throw the baby out with the bathwater. He again complains that the district court did not credit his expert's valuation of Summit. However, we take no issue with the district court's decision to credit only Julie's expert as to Summit's value. And Albert complains that all three businesses—Summit, Fresco, and MarazCo—will require improvements to remain competitive in the future. While that may be true, it does not mean equity requires him to leave the marriage with significantly more than Julie. Albert also claims that Summit has not historically produced excess discretionary income and, when it did, it was reinvested, so he does not have the cash flow to pay a sizable equalization payment. We note the district court was aware of the realities of cash flow and ordered the equalization payment be made over fifteen and one-half years. We find this lengthy repayment period equitable, as it helps reduce the impact of the cash flow requirements that come with Albert's sizable equalization-payment obligation. We also note that, even by Albert's more conservative valuation of Summit, which the district court and we have rejected, it

---

[10] This adjustment also reduces the total net worth of the marital estate from $9,314,291.26 to $9,133,545.26.

remains a multimillion-dollar company that he received in the decree.[11] Equity requires Julie be compensated with an equalization payment.

As previously discussed, we reject Albert's contention that equity requires the premarital value of Summit be set aside as if it is nonmarital property. Likewise, we reject his argument that we should only consider Summit's value as of the parties' separation date instead of the dissolution trial. *See In re Marriage of Campbell*, 623 N.W.2d 585, 587–88 (Iowa Ct. App. 2001). In doing so, we are cognizant that Albert makes no such request with respect to the other businesses or the parties' investment accounts and seeks to value Summit when it was less valuable. *See id.* (considering the fact that the husband was asking that only his retirement account be valued at time of separation—when it was less valuable—in deciding when to value account).

We also reject his notion that Julie did not contribute to the success of the businesses so she should not get a significant property-equalization payment.[12] Julie remained employed during the marriage and provided the family with reliable income and health insurance. With this contribution, Albert was able to focus on his entrepreneurship and take risks knowing the family had separate steady income provided by Julie. It is only equitable that Julie benefits now from providing that stability over the course of the marriage.

After reviewing Albert's various arguments, we agree with the district court's

---

[11] The parties' briefs discuss the ownership of Summit at great length and whether Julie owns any shares in the company. Julie's ownership of shares does not impact our analysis because, no matter the distribution of shares between them, the entire company is a marital asset that was awarded to Albert in the decree.
[12] Albert alluded to this argument in his brief section challenging the valuation of Summit.

decision to award Julie with an equalization payment that would result in the parties leaving the marriage with nearly equal net worths.[13] However, we revisit the amount of the equalization payment due to the adjustments previously discussed. As noted above, the total value of the marital estate after corrections is $9,133,545.26. Julie received $1,267,796.06 in marital net worth. Albert received $7,865,749.20. For the parties to leave on exactly equal footing, Albert would be required to pay Julie an equalization payment of $3,298,976.57. However, the district court chose to award Julie about $40,000 less than what would have evened up the parties' balance sheets. We follow course and order Albert to pay Julie $3,258,000 at $17,516.13 per month for 186 months. All other terms in the dissolution decree remain the same.

Finally, we address Julie's request for appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *McDermott*, 827 N.W.2d at 687 (quoting *Okland*, 699 N.W.2d at 270). When considering an appellate-attorney-fee request, we consider the needs of the requesting party, the other's ability to pay, and the merits of the claims. *Id.* Here, Julie was unsuccessful on her cross-appeal while Albert was partially successful on appeal. And while Albert has resources to pay, Julie does as well. We decline to award her any appellate attorney fees.

**AFFIRMED AS MODIFIED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

---

[13] The district court determined for Julie and Albert to leave with equal net worths, Albert would need to pay Julie $3,388,349.57. However, it ultimately ordered Albert to pay Julie an equalization payment of $3,348,000.